IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-00806-KLM

KRAIG W. PERRY,

 Plaintiff,

v.

UNION PACIFIC RAILROAD COMPANY, a Delaware corporation,

 Defendant.

_____

**ORDER**

_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

 This matter is before the Court on Plaintiff's **Motion for Partial Summary Judgment** [#57],[1] and on Defendant's **Motion for Summary Judgment** [#59]. Defendant filed a Response [#63] in opposition to Plaintiff's Motion [#57], and Plaintiff filed a Reply [#66]. Plaintiff filed a Response [#61] in opposition to Defendant's Motion [#59], and Defendant filed a Reply [#65]. The Court has reviewed the briefs, the entire case file, and the applicable law, and is sufficiently advised in the premises.[2] For the reasons set forth below, Plaintiff's Motion [#57] is **GRANTED in part and DENIED in part**, and Defendant's Motion [#59] is **DENIED**.[3]

_____

 [1] "[#57]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

 [2] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. See [#19, #20].

 [3] *See Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) ("Cross motions for summary judgment are to be treated separately; the

## I. Summary of the Case

The following facts are undisputed unless otherwise stated. Defendant is a railroad and is governed by the provisions of 49 C.F.R. § 240. *Pl.'s Ex. 109* [#57-12]. Defendant transports coal from a nearby mine to Craig Station in the town of Craig in northwestern Colorado. Non-party Tri-State Generation and Transmission Association, Inc. ("Tri-State") has over thirty years of experience operating Defendant's rail equipment on its Craig Station property, an arrangement which is governed by a series of agreements beginning in 1984 between Defendant and Tri-State's predecessors. *Def.'s Ex. A, Heikkila Report* [#59-1] at 1-2 (citing agreements)). Plaintiff is an employee of Tri-State, as is his co-worker Tim Ciesco ("Ciesco"), another non-party.

On November 30, 2017, the date of the accident underlying this lawsuit, three agreements were in force between Defendant and Tri-State: (1) the Interval Lease Agreement ("ILA"), effective June 29, 1984, *Def.'s Ex. B, ILA* [#59-3]; (2) the Rail Transportation Agreement ("RTA") which partially superseded and modified the ILA (in ways not relevant to this lawsuit), effective August 13, 1992, and expiring December 31, 2017, *Def.'s Ex. C, RTA* [#59-4]; and (3) the Industry Track Agreement ("ITA"), effective February 2, 2017, *Def.'s Ex. D, ITA* [#59-5].[4] Each agreement includes a provision permitting Tri-State to perform intra-plant switching of rail equipment. *See, e.g.*, *Ex. C,*

denial of one does not require the grant of another.").

[4] The Locomotive Operation Agreement (Limited Use), as mentioned in Section III.C. below, was being negotiated between Defendant and Tri-State at this time but was not signed until December 22, 2017, approximately three weeks after the November 30, 2017 accident underlying this lawsuit. *Pl.'s Ex. 7, Depo. of Abdali* [#57-8] at 20:1-4; *Pl.'s Ex. 130, May 10, 2016 Email from Sweet to Abdali & Sorenson* [#58-4] (attaching blank draft Locomotive Use Agreement); *Pl.'s Ex. 146, Locomotive Operation Agreement (Limited Use)* [#58-6] (signed agreement dated December 22, 2017).

*RTA* [#59-4] at App'x C, § 2.3 (referring to previous ILA); *Ex. D, ITA* [#59-5] at 5.  "Intra-plant switching" is the process whereby Tri-State employees operated locomotives to unload and move railcars throughout its own facility.

Tri-State owns the coal cars used to transport coal from the mine to Craig Station, but Defendant owns the locomotives which were operated by Tri-State pursuant to the lease in the ILA.  *Ex. C, RTA* [#59-4] at App'x C, § 2.3; *Def.'s Ex. E, Depo. of Osborn* [#59-6] at 111:5-14, 112:3-6.  Defendant delivered loaded coal trains to Tri-State, and Tri-State personnel then operated the trains to unload them on Tri-State property, to perform intra-plant switching, and to ready empty trains to be picked up by Defendant.  *Ex. C, RTA* [#59-4] at App'x C, § 2.3.  Tri-State employees are permitted to perform intra-plant switching of rail equipment on the Craig Station property, but they are not permitted to operate on Defendant's property.  *Def.'s Ex. F, Depo. of Culver* [#59-7] at 70:19-25, 71:1-6.

The ILA contains a provision, "Use in a Safe and Proper Manner," which provides:

> The Lessee [Tri-State] shall be solely and exclusively responsible for the operation and condition after the receipt of Equipment upon taking delivery of the same and such operation will be done in a safe and competent manner.  The operators of the Equipment will be instructed to operate the equipment with reasonable care and diligence and to use reasonable precaution to prevent damage thereto.

*Ex. B, ILA* [#59-3] § 4.2.  This provision was effective at the time of the accident.  *Ex. C, RTA* [#59-4] at App'x C, §2.3.

The ITA similarly permitted intra-plant switching and required Tri-State to "ensure that all employees involved in intra-plant switching are properly trained regarding all applicable Laws."  *Ex. D, ITA* [#59-5] at Special Provision No. 5.  Numerous ITA provisions required Tri-State to properly train and supervise its employees and to comply with all

applicable laws, regulations, and railroad rules; those provisions further specified that Tri-State was at least partly responsible for the safety of operations on its property, including: (1) Art. 8(D): "Industry [Tri-State] shall train and oversee its employees, contractors and agents as to proper and safe working practices to follow when performing any work in connection with this Agreement, including, without limitation, any work associated with Railroad serving Industry over the Track"; (2) Art. 8(H): "[Tri-State] shall comply with all applicable Railroad circulars, AAR Circulars and Manuals, and ordinances, regulations, statutes, rules, decisions and orders . . . issued by any court or federal, state or local governmental entity, including, without limitation, the federal Department of Transportation, the Federal Railroad Administration [("FRA")] and the federal Environmental Protection Agency";[5] (3) Art. 8(I): ". . . [Tri-State] in all events is solely responsible for the safety of its operations and property, and no consent, approval, review, waiver, investigation, observation, knowledge or advice of or by Railroad will relieve [Tri-State] of such responsibility."  *Ex. D, ITA* [#59-5] at 6-8.

Defendant is a party to least five similar agreements in Colorado which permit its customers to operate Defendant's locomotives for intra-plant switching on customer property, including locomotives using "distributed power," as explained further below. *Def.'s Ex. H, Depo. of Honstein* [#59-9] at 86:1-91:25, 96:11-97:5.  The terms that govern Defendant's other locomotive lease agreements in Colorado and elsewhere are similar to the terms of Defendant and Tri-State's agreements, which in part include the requirement

---

[5] As discussed further below, the parties explicitly agree that Tri-State is not a "railroad" subject to the jurisdiction of the Federal Railroad Administration.  *Response* [#61] at 2-3 (citing 49 C.F.R. § 240.3(a), (b)(1); *Pl.'s Ex. 11* [#61-5] (consisting of 49 C.F.R. Part 209 Appendix A, The Extent and Exercise of FRA's Safety Jurisdiction); *Reply* [#65] at 2.

that the customer properly train its employees to operate rail equipment, although Defendant does not otherwise further inquire regarding that training. *Id.* at 82:10-83:11, 86:1-91:25. Thus, Tri-State, not Defendant, was responsible for training Tri-State employees, and Tri-State agrees that Defendant had no obligation to train Tri-State's employees. *Ex. E* [#59-6] at 164:21-165:15.

Distributed power consists of radio communication and airlink between one locomotive and another locomotive which is not physically attached to the first. *Id.* at 47:22-48:1. One controlling locomotive is mirrored by remote units; in other words, actions taken by the controlling locomotive are automatically duplicated by the non-controlling, remote units. *Id.* Distributed power locomotives are in widespread use on railroads throughout North America on mixed freight, intermodal, and bulk commodity trains, such as coal trains, including those operated by Defendant. *Def.'s Ex. G* [#59-8] at 16. Distributed power is common on large railroads in mountainous areas, has been used since the 1980s, and was used more often in the late 1990s and early 2000s. *Def.'s Ex. I, Depo. of Slade* [#59-10] at 51:13-52:14, 69:10-70:3; *Ex. F* [#59-7] at 60:20-61:8. Distributed power operations are generally safe and effective in improving train handling, but only when used under the proper circumstances. *Ex. G* [#59-8] at 16; *Ex. I* [#59-10] at 53:3-25, 69:6-70:3.

Defendant supplied Tri-State with locomotives operated by distributed power for at least ten years prior to the accident. *Ex. E* [#59-6] at 154:8-13. Tri-State did not expect Defendant to communicate to Tri-State whether locomotives were left in distributed power when dropped off at the Craig Station. *Ex. E* [#59-6] at 155:1-23. Typically, but not always, however, Defendant's train crew would take the train out of distributed power after it was

"spotted" at Tri-State.  *Ex. 1, Depo. of Pl.* [#57-2] at 107:4-6.

Regarding the specific events underlying this lawsuit, Plaintiff and his co-worker Mr. Ciesco, both of whom were heavy equipment operators, worked under the direction and control of Tri-State, not Defendant.  *Ex. J, Depo. of Perry* [#59-11] at 94:18-21; *Ex. K, Depo. of Ciesco* [#59-12] at 181:8-12; *Ex. E* [#59-6] at 150:5-23.   In fact, none of Defendant's employees were present at the time of accident.  *Ex. H* [#59-9] at 124:1-20. Plaintiff was a "groundsman" who was responsible for directing the locomotive(s) and cars and, essentially, was Mr. Ciesco's eyes and ears on the ground.  *Ex. K* [#59-12] at 52:8-16, 46:19-47:2, 195:9-11.  Plaintiff was able to communicate with Mr. Ciesco via radio at all times prior to the accident.  *Ex. J* [#59-11] at 118:2-17; 125: 13-127:1.

On November 30, 2017, the pair was tasked by their supervisor to (1) unload a 55-car coal train which had been delivered by Defendant, which they successfully accomplished before their lunch break, and (2) switch three cars loaded with lime from the middle track to the north track.  Both of these tasks required the operation of locomotive(s). *Ex. J* [#59-11] at 128:6-15, 131:12-133:18; *Ex. 1, Depo. of Pl.* [#57-2] at 97:18-21.  The pair began the second task after lunch and successfully completed a few train movements before the incident.  *Ex. J* [#59-11] at 131:12-133:18; *Ex. K* [#59-12] at 193:8-20.  At the time of the accident itself, the train consisted of the controlling locomotive, UP 8807, located on the east end facing east, followed by 55 empty coal cars and two remote locomotives in distributed power on the west end.  *Ex. G* [#59-8] at 5-6.  The task required disconnecting the lead locomotive and one coal car from the train, pulling the locomotive and coal car forward and then backing down a separate middle track to pick up the lime cars for unloading.  *Ex. G* [#59-8] at 5-6.

Plaintiff was responsible for disconnecting the lead locomotive and attached car from the rest of the empty coal train, but when he did so, he engaged in an improper procedure known as "bottling the air," i.e., he trapped the air in the brake lines of the coal cars and remote locomotives attached to the rear, meaning that the air brakes remained in the "off" position in which they had been left. *Ex. J* [#59-11] at 153:12-18; *Ex. F* [#59-7] at 62:24-63:2; *Ex. G* [#59-8] at 8. "Bottling the air" is dangerous and violates federal safety regulations, and it is unlikely, if not impossible, that this accident would have happened if Plaintiff had not bottled the air. *Ex. F* [#59-7] at 62:15-17, 63:1-2, 7-14. Plaintiff had not set hand brakes on any of the cars that were detached, and the train was therefore free to move. *Ex. J* [#59-11] at 153:12-18; *Ex. F* [#59-7] at 62:24-63:2; *Ex. G* [#59-8] at 8. In addition, Mr. Ciesco had not set out, i.e., unlinked, the locomotive he was operating from distributed power. *Ex. 16, Depo. of Ciesco* [#61-10] at 36:2-5. Plaintiff's recollection of what happened next is: (1) the car and locomotives on the east end began to move, (2) he perceived the train to be a "runaway" train, (3) he left his position and ran to his truck, (4) he chased after the train, (5) he exited his vehicle, (6) without notifying Mr. Ciesco by radio or otherwise, he went to car 46 and straddled the rail with one foot on each side of the rail, (7) he reached to set the handbrake, and (8) the train began to move, knocking him under the car. *Ex. J* [#59-11] at 170:5-16, 173:20-8, 178:18-21, 182:18-22, 184:8-15, 186:8-187:14. Plaintiff was severely injured as a result of this accident.

In this lawsuit, Plaintiff asserts that Defendant's negligence, at least in part, was the cause of his injury. *See generally Am. Compl.* [#15]. Each party has filed a partial cross-

motion seeking entry of summary judgment against the opposing party.[6]  In his Motion [#57], Plaintiff asks the Court to enter partial summary judgment in his favor as to the issues of duty and breach on his negligence claim, as asserted pursuant to 49 C.F.R. § 240 and Colorado Law, Restatement (Second) Torts §§ 308 and 390.  *Motion* [#57] at 20.  In its Motion [#59], Defendant asks the Court to enter summary judgment in its favor on the bases that: (1) Defendant owed no duty to Plaintiff; (2) no reasonable jury could find that Plaintiff was less than fifty percent at fault for his injuries; and (3) Plaintiff's claims are preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA") and/or to the extent they are inconsistent with federal regulations, including those promulgated under the Federal Railroad Safety Act ("FRSA").  *Motion* [#59] at 2-3.

## II. Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive

---

[6]  *See Boyz Sanitation Serv., Inc. v. City of Rawlins, Wyo.*, 889 F.3d 1189, 1195 (10th Cir. 2018) ("Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."); *see also Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004) ("On cross-motions for summary judgment, . . . we must view the inferences to be drawn from affidavits, attached exhibits and depositions in the light most favorable to the party that did not prevail.").

law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 (4th ed. 2017).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most

favorable to the party opposing summary judgment. *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

Only documents that meet the evidentiary requirements of Fed. R. Civ. P. 56 may be considered for purposes of summary judgment. Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]
> > . . .
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

## III. Analysis

### A. Federal Preemption

At the outset, the Court notes that federal preemption is an affirmative defense, and therefore Defendant bears the burden of proof and must present sufficient evidence to satisfy its burden of production. *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1133-34

(10th Cir. 2007).

### 1. ICCTA

Defendant argues that Plaintiff's claims are preempted by ICCTA, because that statute broadly bars any state regulation, including state law tort claims, which interferes with or burdens rail operations. *Motion* [#59] at 3. Defendant asserts that Plaintiff, in attempting to impose a duty on Defendant, necessarily attempts to classify distributed power locomotives as ultrahazardous, which would impermissibly burden rail transportation. *Id.* Defendant fails to explain, though, how such a designation would actually burden rail transportation.

Congress's express objective in passing ICCTA "was to establish an exclusive Federal scheme of economic regulation and deregulation for railroad transportation." *Emerson*, 503 F.3d at 1132. To achieve this goal, Congress included a preemption provision: "Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). ICCTA gives the Surface Transportation Board ("STB") exclusive jurisdiction over "transportation by rail carriers and the remedies provided with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers . . . ." 49 U.S.C. § 10501(b)(1). The word "transportation" is broadly defined to include: "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use . . . ." 49 U.S.C. § 10102 (9)(A).

-11-

The Tenth Circuit Court of Appeals has held that, "in order to decide whether § 10501(b) impliedly preempts application of the [Colorado] tort laws at issue here, a factual assessment must be made as to whether requiring the [r]ailroad to remedy the injury claimed by the [plaintiff] would have the effect of preventing or unreasonably interfering with railroad transportation." *Emerson*, 503 F.3d at 1133. However, Tenth Circuit case law applying this standard under circumstances comparable to those before the Court in the present action is scant.

Plaintiff provides a number of cases from other jurisdictions where courts have determined that ICCTA does not preempt lawsuits based on safety. In *Tyrrell v. Norfolk Southern Railway Company*, 248 F.3d 517, 523 (6th Cir. 2001), the Sixth Circuit Court of Appeals stated:

> While the STB must adhere to federal policies encouraging "safe and suitable working conditions in the railroad industry," the ICCTA and its legislative history contain no evidence that Congress intended for the STB to supplant the FRA's authority over rail safety. 49 U.S.C. § 10101(11). Rather, the agencies' complementary exercise of their statutory authority accurately reflects Congress's intent for the ICCTA and FRSA to be construed *in pari materia*. For example, while recognizing their joint responsibility for promoting rail safety in their 1998 Safety Integration Plan rulemaking, the FRA exercised primary authority over rail safety matters under 49 U.S.C. § 20101 et seq., while the STB handled economic regulation and environmental impact assessment.

In *Waubay Lake v. BNSF Railway Co.*, No. CIV 12-4179-RAL, 2014 WL 4287086 (D.S.D. August 28, 2014), the District Court for the District of South Dakota noted:

> ICCTA and FRSA are two components of a multi-part federal-state regulatory partnership addressing railroad industry issues. *See Iowa, Chi. & E. R.R. Corp. v. Wash. Cnty.*, 384 F.3d 557, 558-60 (8th Cir. 2004). Both ICCTA and FRSA preempt state statutes and regulations in some circumstances. *Id.*; *see also* 49 U.S.C. §§ 10501(b), 20106(a). The two statutes are complimentary [sic] and the two federal agencies empowered to implement the statutes exercise complimentary [sic] powers. *Tyrrell v. Norfolk S. Ry.*,

248 F.3d 517. 523 (6th Cir. 2001).  When the state statute addresses rail safety, then courts analyze preemption under FRSA.  *Id.*; *see also Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 107 (2d Cir. 2009) ("Several circuits that have examined the interplay between ICCTA and FRSA have concluded that the federal statutory scheme places principal federal regulatory authority for rail safety with the Federal Railroad Administration . . . , not the STB.").  When the state statute addresses construction or economic concerns, then courts analyze preemption under ICCTA.  *Tyrell*, 248 F.3d at 523.

In *Griffioen v. Cedar Rapids and Iowa City Railway Company*, 914 N.W.2d 273, 278-79

(Iowa 2018), the Iowa Supreme Court wrote:

> Two categories of state-law tort claims typically are not preempted by the ICCTA.  One is a tort claim that challenges a railroad's activities other than the maintenance and operation of its rail lines.  A second category of claims are those relating to rail safety, where a separate, narrower preemption provision in the Federal Rail Safety Act (FRSA) applies.  *See* 49 U.S.C. § 20106; *Tyrrell v. Norfolk S. Ry.*, 248 F.3d 517, 523-25 (6th Cir. 2001) (finding that the FRSA rather than the ICCTA governed a trainman's personal injury claim and the claim was not preempted); *Waneck v. CSX Corp.*, No. 1:17cv106-HSO-JCG, 2018 WL 1546373, at *4-6 (S.D. Miss. Mar. 29, 2018) (finding in a personal injury case that tort claims relating to the design and maintenance of the crossing and related rail structures were governed by the ICCTA and therefore preempted, whereas claims relating to the railroad's failure to slow the train related to rail safety, were therefore governed by the FRSA, and were not preempted).  In short, "there is nothing in the case law that supports [the] argument that, through the ICCTA, Congress only intended preemption of economic regulation of the railroads."  If a state-law tort claim requires second-guessing of a railroad's operation and management of its own rail lines as opposed to other activities, and the claim does not pertain to rail safety, it is preempted by the ICCTA.

(some internal citations omitted).  In *In re Union Pacific Railroad Company*, 582 S.W.3d

548, 553 (Tex. App. 2018), the Texas Court of Appeals explicitly held that "the ICCTA

does not expressly preempt negligence claims based on an alleged failure to comply with [FRSA]

safety regulations."  Finally, most recently, in *Gordon v. New England Central Railroad,

Inc.*, No. 2:17-CV-00154, 2019 WL 5084160, at *11 n.6 (D. Vt. Oct. 10, 2019), the District

Court for the District of Vermont stated:

Defendant argues that Plaintiffs' negligence claim is preempted by the ICCTA. However, because the FRSA provides the applicable preemption clause, Defendant's reliance on ICCTA preemption is misplaced. *See Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009) ("[The] FRSA provides the appropriate basis for analyzing whether a state law, regulation or order affecting rail safety is pre-empted by federal law."); *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 524 (6th Cir. 2001) (holding that where a regulation has a "connection with rail safety . . . [the] FRSA provides the applicable standard for assessing federal preemption"); *Smith v. CSX Transp., Inc.*, No. 3:13 CV 2649, 2014 WL 3732622, at *2 (N.D. Ohio July 25, 2014) (holding that because plaintiffs' allegations "involve railroad safety procedures, which the FRSA—not the ICCTA—was enacted to regulate[,] . . . the ICCTA does not preempt [p]laintiffs' claims").

The Court is aware of no binding or persuasive legal authority within the Tenth Circuit which would counsel a different conclusion under the circumstances of this case from that reached under similar circumstances by the above circuit and district courts. Moreover, Defendant has not shown that "a finding that distributed power is ultrahazardous" would actually "invade the province of STB and impermissibility burden rail transportation."[7] *Motion* [#59] at 19. The basis of Plaintiff's negligence claim pertains to railroad safety procedures and Defendant's alleged failure to comply with those procedures which ultimately caused his personal injury. Thus, the Court finds that ICCTA does not preempt Plaintiff's claim.

Accordingly, Defendant's Motion [#59] is **denied** to the extent Defendant seeks entry of summary judgment in its favor on the issue of ICCTA preemption.

### 2.    FRSA

Defendant also argues that Plaintiff's claims are generally preempted to the extent they are inconsistent with federal regulations. *Motion* [#59] at 3. Defendant grounds this

---

[7] As discussed further in Section III.C., a finding that distributed power is ultrahazardous is not required for Plaintiff to succeed on his negligence claim, although such a finding does relate to the scope of Defendant's duty.

argument on the fact that Tri-State is not a "railroad" and therefore not subject to the relevant provisions of the FRA's regulations, as promulgated under the FRSA. *Id.* at 19-20.

The Court is unconvinced by Defendant's argument.  First, Plaintiff's claim is asserted against Defendant, not Tri-State.  Thus, the mere fact that *Tri-State* employees may not be required to comply with the relevant federal regulations is not dispositive as to whether the claim as asserted against *Defendant* is preempted.[8]

Second, Defendant's argument that "[i]t is well established that FRA regulations under the FRSA preempt any state-law requirement with respect to the 'subject matter' covered by the regulations, including any requirement imposed through common-law tort actions" is not entirely correct, as a matter of law.  *Motion* [#59] at 20 (citing 49 U.S.C. § 20106(a)(2); 49 C.F.R. § 213.2).  The FRSA's preemption clause specifically states that the FRSA does *not* "preempt an action under State law seeking damages for personal injury, death, or property damage" based on a claim that a railroad has "failed to comply with the Federal standard of care established by a regulation or order . . . ; has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order . . . ; or has failed to comply with a State law, regulation, or order that is not incompatible with [49 U.S.C. § 20106(a)(2)]."  49 U.S.C. § 20106(b).  Thus, as discussed in greater detail in Section III.C. below, because Plaintiff's claim is based on Defendant's alleged failure "to comply with the Federal standard of care established by a regulation," Plaintiff's negligence claim is not preempted by the FRSA.  *See, e.g.*, *Gordon*, 2019 WL 5084160, at *12 (holding similarly) (citing *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 178 (3d Cir. 2013) (holding

---

[8]  The Court further addresses the applicability of the relevant regulations to Tri-State in Section III.C. below.

that, under the FRSA, if the "defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation[,] . . . the plaintiff's claim avoids preemption")).

Accordingly, Defendant's Motion [#59] is **denied** to the extent Defendant seeks entry of summary judgment in its favor on the issue of FRSA preemption.

## B.   Contributory Negligence

Colorado recognizes a general tort of negligence, *see, e.g.*, *Colo. Jury Instr.*, Civil Ch. 9 Intro.  Under Colorado law "the elements of a negligence claim are that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's injury." *Ayala v. United States*, 49 F.3d 607, 611 (10th Cir. 1995) (citing *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo.1992)).  Assuming that Defendant owed a duty to Plaintiff (an issue which the Court addresses in Section III.C. below), Defendant next argues that Plaintiff's own negligence bars recovery because "[n]o reasonable jury could find that Plaintiff was not at least fifty percent responsible for his injuries in this case . . . ." *Motion* [#59] at 15.

Defendant relies on Colo. Rev. Stat. § 13–21–111 and *Reid v. Berkowitz*, 315 P.3d 185, 195 (Colo. App. 2013).  The statute provides: "(1) Contributory negligence shall not bar recovery . . . [for] damages for negligence resulting in death or in injury to person or property, if such negligence was not as great as the negligence of the person against whom recovery is sought . . . ."  In *Reid*, the Colorado Court of Appeals emphasized that a plaintiff must "be cognizant of the physical conditions and surroundings present when he or she acts or fails to act," that he must exercise "those qualities of attention, knowledge, intelligence, and judgment which society requires of its members for the protection of their

own interests," that he "must exercise such perception of the circumstances, memory, knowledge of other pertinent matters, intelligence, and judgment as a reasonable person would exercise to avoid an unreasonable risk of harm," and that one's failure to protect his own interest or avoid harm where possible may constitute contributory negligence.  *Reid*, 315 P.3d at 195.

Plaintiff, on the other hand, argues that apportionment of negligence between Defendant, Tri-State, and Plaintiff is a factual question for the jury.  *Response* [#61] at 12. Plaintiff agrees that, pursuant to Colo. Rev. Stat. § 13–21–111(1), if a plaintiff is 50% or more at fault, there is no recovery.  *Id.*  Plaintiff points out that, where there is a defendant and a properly designated non-party at fault, such as Defendant and Tri-State in this matter, the plaintiff's negligence is compared to the total combined negligence of the named party and non-party at fault.  *Id.* (citing Colo. Rev. Stat. § 13–21–111.5; *B.G.'s, Inc. v. Gross ex rel. Gross*, 23 P.3d 691, 693 (Colo. 2001), *as modified* (May 21, 2001) (stating that, pursuant to § 13–21–111.5(3), "any fault attributable to designated nonparties is similarly considered in the aggregate with the defendants' negligence for purposes of determining whether the plaintiff is entitled to recovery")).  Therefore, the jury in this matter will be asked to assess fault on the part of Defendant, fault on the part of Tri-State (which includes fault on the part of Mr. Ciesco), and fault on the part of Plaintiff.  *Response* [#61] at 12.  This means that Plaintiff's negligence will be compared with the total combined negligence of Defendant and Tri-State in applying the comparative fault statute, i.e., Colo. Rev. Stat. § 13–21–111.

The Court cannot conclude that judgment as a matter of law is appropriate here, because based on the evidence provided by the parties taken in a light most favorable to

Plaintiff as the non-movant, the Court finds that a reasonable jury could conclude that Plaintiff was not at least 50% negligent. By way of example only, there is some evidence that Plaintiff violated his Tri-State training when he stepped between the railcars, and that he made a "big mistake" and could have avoided the accident if he had communicated with Mr. Ciesco. *Ex. E* [#59-6] at 163:1-19; *Ex. K* [#59-12] at 200:12-201:2. On the other hand, Defendant's train crew would usually, but not always, already have taken the train out of distributed power when it was delivered to the Tri-State facility. *Ex. 1* [#57-2] at 107:4-6. Mr Ciesco did not unlink the locomotive he was operating from distributed power and, indeed, he did not know the process for doing so on the locomotive he was operating. *Ex. 16* [#61-10] at 36:2-21. In fact, Mr. Ciesco's training as a heavy equipment operator did not include any formal training or instruction in operating locomotives in distributed power, and he did not receive any on-the-job training about it either. *Ex. 4* [#57-5] at 16:1-12, 26:22-27:2, 103:22-104:10, 168:9-19; *Ex. 5* [#57-6] at 18:22-19:12. Plaintiff was never properly trained on when to use handbrakes. *Ex. 14* [#61-8] at 90:12-20. In addition, Defendant did not warn Tri-State or its employees of the complexities of operating locomotives linked by distributed power, did not provide any training to them, and never asked Tri-State if its employees were competent to operate locomotives linked by distributed power.[9] *Ex. 2* [#57-3] at 48:11-18, 48:25-49:7, 54:13-18, 55:24-56:8; *Ex. 3* [#57-4] at 61:24-62:12, 97:24-98:21, 155:6-21; *Ex. 4* [#57-5] at 24:25-25:19, 154:13-156:20. In short, there are genuine

_____

[9] The Court emphasizes that it is making no finding that Defendant was required to act in any particular way. As explained further in Section III.C., Defendant had a duty to ensure that its lessee's employees were qualified locomotive engineers who were competent to operate locomotives by distributed power, but the *scope* of that duty, and whether Defendant complied with it, is a matter for the jury. Taking all facts in a light most favorable to Plaintiff, the jury *may* determine that this evidence should be taken into account when allocating negligence.

issues of material fact here which must be resolved by a jury.

Accordingly, Defendant's Motion [#59] is **denied** to the extent Defendant asks the Court to hold as a matter of law that Plaintiff's own comparative negligence bars his recovery.

## C.     Whether Defendant Owed a Duty to Plaintiff

"The threshold question in any negligence action is . . . 'whether the defendant owed a legal duty to protect the plaintiff against injury.'" *Ayala*, 49 F.3d at 611 (quoting *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1320 (Colo.1992)).  As the parties agree, "[w]hether such a duty exists is a question of law to be determined by the court." *Id.*; *Motion* [#59] at 10; *Motion* [#57] at 12.  Here, Plaintiff argues that Defendant negligently breached its duties under federal regulations, specifically 49 C.F.R. § 240.201(d), and under the Restatement (Second) of Torts, specifically § 308 and § 390.  *Motion* [#57] at 12-20.  Meanwhile, Defendant, in its own cross-motion for summary judgment, asserts two main arguments.  First, it argues that Plaintiff was not performing work for Defendant or Defendant's benefit at the time of his injury and that Defendant was not Plaintiff's employer, and therefore that Defendant owed no duty to Plaintiff as a matter of law.  *Motion* [#59] at 11.  Second, Defendant argues that the theory of negligent entrustment does not save Plaintiff's claims by imposing a duty on Defendant.  *Id.* at 13.

The Court begins with the language of the regulation at issue, i.e., 49 C.F.R. § 240.  *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002).  The Court must "'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'"  *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).  To do this, the Court considers "the specific context in which the

-19-

language is used, and the broader context of the [regulation] as a whole." *Robinson*, 519

U.S. at 341.   "This is 'a holistic endeavor,' taking into account, at a minimum, the

'[regulation's] full text, language as well as punctuation, structure, and subject matter.'"

*Carpio v. Holder*, 592 F.3d 1091, 1098 (10th Cir. 2010) (quoting *United States Nat'l Bank*

*of Oregon v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 455 (1993)).

FRA regulation 49 C.F.R. § 240 generally concerns "Qualifications and Certification

of Locomotive Engineers."[10]  The "[p]urpose and scope" of this regulation is as follows: "(a)

The purpose of this part is to ensure that only qualified persons operate a locomotive or

train.  (b) This part prescribes minimum Federal safety standards for the eligibility, training,

testing, certification and monitoring of all locomotive engineers to whom it applies.  (c) The

qualifications for locomotive engineers prescribed in this part are pertinent to any person

who operates a locomotive . . . ."  49 C.F.R. § 240.1.

The parties agree that Tri-State is a "plant railroad."[11]  *Motion* [#57] at 17; *Response*

[#63] at 10.  This regulation as a whole, 49 C.F.R. § 240, "applies to all railroads [except]:

---

[10]  This regulation was recently amended, effective January 14, 2021. Unless otherwise stated, the Court cites to the version of the regulation in effect at the time of the events underlying this lawsuit.

[11]  The version of 49 C.F.R. § 240 in effect at the time of the accident did not include a definition of "plant railroad," but the current iteration of the regulation does so, explaining that: "Plant railroad means a plant or installation that owns or leases a locomotive, uses that locomotive to switch cars throughout the plant or installation, and is moving goods solely for use in the facility's own industrial processes.  The plant or installation could include track immediately adjacent to the plant or installation if the plant railroad leases the track from the general system railroad and the lease provides for (and actual practice entails) the exclusive use of that trackage by the plant railroad and the general system railroad for purposes of moving only cars shipped to or from the plant.  A plant or installation that operates a locomotive to switch or move cars for other entities, even if solely within the confines of the plant or installation, rather than for its own purposes or industrial processes, will not be considered a plant railroad because the performance of such activity makes the operation part of the general railroad system of transportation."  49 C.F.R. § 240.7.  No issue addressed in this Order hinges on this definition, and the Court merely provides it for clarification of the meaning of this phrase.

(1) [a] railroad that operates only on track inside an installation that is not part of the general railroad system of transportation . . . ." 49 C.F.R. § 240.3(a).[12] The parties agree that, as a plant railroad, Tri-State is not *directly* required to comply with 49 C.F.R. § 240. *Response* [#63] at 10; *Reply* [#66] at 5.

The question here is whether Defendant was legally obligated to ensure that Tri-State *indirectly* complied with 49 C.F.R. § 240 because Tri-State's employees were using Defendant's locomotives at the time of the accident. The parties agree that Defendant is a "railroad" and therefore *is* required to comply with 49 C.F.R. § 240. *Motion* [#57] at 4; *Response* [#63] at 1; *see* 49 C.F.R. § 240.3 ("Application and responsibility for compliance," stating in relevant part "(a) . . . this part applies to all railroads . . ."). Under the title "Implementation," the regulation provides: "No railroad shall permit . . . any person to operate a locomotive in any class of locomotive or train service unless that person has been certified as a qualified locomotive engineer and issued a certificate that complies with § 240.223." 49 C.F.R. § 240.201(d).

Plaintiff emphasizes the regulatory definitions of several words of this provision. *Motion* [#57] at 13. The word "railroad" means "any form of nonhighway ground transportation that runs on rails or electromagnetic guideways and any entity providing such transportation . . . ." 49 C.F.R. § 240.7. The word "person" means "an entity of any type covered under 1 U.S.C. [§] 1, including but not limited to the following: a railroad; a manager, supervisor, official, or other employee or agent of a railroad; any owner,

---

[12] The Court notes that the January 14, 2021 amendment clarifies this regulation by adding a parenthetical specifically noting that plant railroads are not included under "all railroads": "This part applies to all railroads, except: (1) Railroads that operate only on track inside an installation that is not part of the general railroad system of transportation (i.e., plant railroads, as defined in § 240.7) . . . ." 49 C.F.R. § 240.3(a).

manufacturer, lessor, or lessee of railroad equipment, track, or facilities; any independent contractor providing goods or services to a railroad; and any employee of such owner, manufacturer, lessor, lessee, or independent contractor." *Id.* The word "locomotive" means "a piece of on-track equipment (other than specialized roadway maintenance equipment or a dual purpose vehicle operating in accordance with § 240.104(a)(2)): (1) [w]ith one or more propelling motors designed for moving other equipment; (2) [w]ith one or more propelling motors designed to carry freight or passenger traffic or both; or (3) [w]ithout propelling motors but with one or more control stands." *Id.* The word "qualified" means "a person who has passed all appropriate training and testing programs required by the railroad and this part and who, therefore, has actual knowledge or may reasonably be expected to have knowledge of the subject on which the person is qualified." *Id.* The phrase "locomotive engineer" means "any person who moves a locomotive or group of locomotives regardless of whether they are coupled to other rolling equipment except: (1) [a] person who moves a locomotive or group of locomotives within the confines of a locomotive repair or servicing area as provided for in 49 CFR 218.5 and 218.29(a)(1); or (2) [a] person who moves a locomotive or group of locomotives for distances of less than 100 feet and this incidental movement of a locomotive or locomotives is for inspection or maintenance purposes." *Id.*

The parties agree that Tri-State leased Defendant's locomotives while those locomotives were on Tri-State property. *Motion* [#57] at 6; *Response* [#63] at 5. Plaintiff therefore argues that Tri-State and its employees, including Plaintiff and Mr. Ciesco, are considered "persons" under the regulatory definition of the word, which includes "any . . . lessee of railroad equipment . . . and any employee of such . . . lessee." 49 C.F.R. § 240.7;

*Motion* [#57] at 13.  Thus, Plaintiff asserts, Defendant "must not permit [Mr.] Ciesco to operate a locomotive in any class of locomotive or train service because he has not been certified as a qualified locomotive engineer and issued a certificate that complies with § 240.223."  *Motion* [#57] at 13.  Plaintiff avers that this conclusion is consistent with the FRA's intent behind the rule: "FRA is adopting this regulation to minimize the potentially grave risks posed when unqualified people operate trains."  *Motion* [#57] at 13 (citing *Pl.'s Ex. 189* [#57-15] (quoting Qualifications for Locomotive Operators, 56 Fed. Reg. 28228-01, 1991 WL 291561 (June 19, 1991))).

In opposition, Defendant directs the Court's attention to 49 C.F.R. 240.1(c), which provides: "The qualifications for locomotive engineers prescribed in this part are pertinent to any person who operates a locomotive, **unless that person is specifically excluded** by a provision of this part, regardless of the fact that a person may have a job classification title other than that of locomotive engineer."  *See, e.g.*, *Response* [#63] at 13 (emphasis added).  Defendant argues that, even if Tri-State and its employees are "persons" under the regulatory definition, they are "specifically excluded" by 49 C.F.R. § 240.3(b), and therefore Defendant was under no obligation to ensure that Tri-State's employees were "qualified locomotive engineers."  *Id.* at 13-14.

This argument brings the Court back to the original question: even if Tri-State was not directly required by the regulation to have "qualified locomotive engineers" at its plant railroad, was Defendant required by regulation to ensure that its own leased locomotive equipment was operated only by "qualified locomotive engineers," regardless of who the lessee of that equipment was?  Ultimately, the Court finds that Defendant had a duty to ensure that Tri-State employees who operated Defendant's locomotives were qualified

locomotive engineers.  A plant railroad which only operates its own equipment on its own property has no obligation to comply with 49 C.F.R. § 240, as the parties agree.  *See* 49 C.F.R. § 240.3.  But the regulatory definition of "person" includes "*any* . . . lessee of railroad equipment . . . and *any* employee of such . . . lessee."  49 C.F.R. § 240.7 (emphases added).  Per the implementation regulation, "[n]o railroad [i.e., Defendant] shall permit . . . any person [including any lessee and any lessee's employee] to operate a locomotive in any class of locomotive or train service unless that person has been certified as a qualified locomotive engineer and issued a certificate that complies with § 240.223."  49 C.F.R. § 240.201(d).  Nothing exempts Defendant from complying with its burden that *anyone* who leases its equipment must be certified to operate it.

Put another way, pursuant to 49 C.F.R. § 240.7, a "railroad" is only one type of "person."  "Person" is a much broader concept, which includes, separately from a "railroad," any "lessee of railroad equipment" and the lessee's employees.  49 C.F.R. § 240.7.  Under 49 C.F.R. § 240.3, one type of "railroad" is excluded, but there are no exclusions for other types of persons, including lessees and their employees.  This regulation, 49 C.F.R. § 240.3, could have been written to exclude any "railroad *or other person* that operates only on track inside an installation that is not part of the general railroad system of transportation," but the rulemakers chose not to do so.  This difference is not simply immaterial nuance.  As written, the regulation does not apply to a plant railroad operating its own equipment on its own property, but a railroad such as Defendant must ensure that anyone to whom it leases its equipment, with no exception for plant railroads, must comply with the same requirements as Defendant in the operation of that equipment.  This conclusion is bolstered by the fact that Defendant's own form Locomotive Use Agreement

requires that the lessee "must have a certified locomotive engineer (DPU qualified) operate the [e]quipment when in use." *Pl.'s Ex. 146* [#58-6] at 3 (copy signed by Defendant and by Tri-State on December 22, 2017, after the date of the accident underlying this lawsuit); *but see Ex. 7* [#57-8] at 29:25-31:4 (when Tri-State representative Mr. Abdali questioned this provision during negotiations occurring prior to the accident, Defendant's representative Ms. Sweet stated that Defendant would not remove this provision from the contract but that Defendant would not enforce it either).

Accordingly, the Court finds as a matter of law that, pursuant to 49 C.F.R. § 240, Defendant had a duty to ensure that its leased equipment was operated only by qualified locomotive engineers. *See, e.g.*, 49 U.S.C. § 20106(b) (the FRSA's preemption clause specifically contemplating duty based on a defendant's failure "to comply with the Federal standard of care established by a regulation"); *Zimmerman*, 706 F.3d at 178 (holding that a cause of action could be based on the "defendant allegedly violat[ing] either a federal standard of care or an internal rule that was created pursuant to a federal regulation . . .). However, finding that there *is* a duty, the next question is how far that duty extends. Were the signed agreements in effect at the time of the accident enough to transfer the duty to Tri-State to ensure that leased locomotives were operated by qualified locomotive engineers, or did Defendant have a duty to do more to ensure compliance?  In other words, what is the scope of Defendant's duty?

To answer this question, Plaintiff turns to the Restatement (Second) of Torts. Section 308 therein provides: "It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the

activity in such a manner as to create an unreasonable risk of harm to others."  In addition, Section 390 provides: "One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them."  Section 390 is essentially "a particular application of the more general rule of section 308 . . . ." *Casebolt v. Cowan*, 829 P.2d 352, 358 (Colo. 1992).

In short, these two sections outline the basic elements of the doctrine of negligent entrustment.  *Id.* at 356-57 (citing *Restatement* §§ 308, 390).  As Plaintiff points out, the Colorado Supreme Court in *Casebolt v. Cowan*, 829 P.2d at 357, explicitly "confirm[ed] that the doctrine of negligent entrustment is part of the law of negligence in this state."  "The doctrine of negligent entrustment provides a framework for resolution of the issue of duty, and also identifies criteria for assessing exercise of reasonable care in light of the apparent risk under particular circumstances."  *Casebolt*, 829 P.2d at 356.  In other words, as the Colorado Supreme Court explained, § 390 "provides a basis for resolving the issue[ ] of . . . the specific standard of care (the criteria for assessing reasonable care in light of apparent risk) in the context of supplying chattels for the use of others."  *Id.* at 357.  But, the standard of § 390 applies "[o]nly if the risk of harm resulting from the entrustment can be characterized as 'unreasonable' . . . ."  *Id.* at 359.

The primary issue here is whether locomotives powered by distributed power are inherently dangerous, and thus whether use of those locomotives thereby creates an "unreasonable risk of physical harm" under § 390 to those who are not properly trained as

qualified locomotive engineers. *See Pl.'s Motion* [#57] at 19 ("Therefore, under Colorado law, [Defendant] was required to ascertain that employees of Tri-State who operated the locomotives, including [Mr.] Ciesco, were competent to operate a locomotive, particularly when [Defendant] delivers locomotives linked by distributed power which [Defendant] agrees pose 'grave risks' when operated by unqualified people."). If there *is* an unreasonable risk, then the scope of Defendant's duty in ensuring compliance with 49 C.F.R. § 240 is arguably broader than it would be if there is *not* an unreasonable risk. *See Def.'s Motion* [#59] at 15 ("Finally, it is undisputed that [Defendant] used reasonable care in contractually requiring Tri-State to properly train its employees and follow applicable rules and regulations for the use and operation of its locomotives. Being that the risk of harm must be 'unreasonable' to impose a duty through negligent entrustment, no such duty can be imposed on [Defendant] here. [Defendant] did not simply hand the locomotive keys to Tri-State and walk away; [Defendant] ensured that contractual requirements were in place prior to allowing any locomotive use by Tri-State. Plaintiff's attempt to impose [an additional] duty of care on [Defendant] through negligent entrustment allegations should be rejected.").

Although the issue of whether a duty exists is to be decided as a matter of law, the issue of the *scope* of that duty may be precluded on summary judgment if there are genuine issues of material fact in dispute. *See Casebolt*, 829 P.2d at 362-63. "In order to prevail, [Plaintiff] must establish that [Defendant] knew or had reason to know that [Plaintiff, his employer, or his coworker(s)] would be *likely* to use the [locomotive] in a manner involving unreasonable risk of physical harm to [Plaintiff]." *Id.* at 362. Here, there are issues of fact both as to (1) whether Defendant "knew or had reason to know" and (2)

whether the risk of harm was "unreasonable." *See, e.g.*, *Ex. E* [#59-6] at 154:8-22, 155:1-23, 180:10-21 (stating that Tri-State did not perceive distributed power as an unsafe condition, that Defendant had supplied Tri-State with locomotives operated by distributed power for at least ten years prior to the accident, that Tri-State and its employees had operated those locomotives almost every day, and that there had not been injury incidents involving distributed power like Plaintiff's prior to the accident); *Ex. G* [#59-8] at 16 (stating that distributed power locomotives are in widespread use on railroads throughout North America on mixed freight, intermodal, and bulk commodity trains, such as coal trains, including those operating by Defendant, and are safe and effective in improving train handling); *Ex. H* [#59-9] at 82:10-83:11; 86:1-91:25 (stating, in short, that Defendant requires the customer to properly train its employees to operate rail equipment and does not inquire regarding that training); *Ex. I* [#59-10] at 69:10-70:3 (stating that distributed power is not unique because, like other railroad equipment, if used improperly it can be dangerous); *Ex. 2* [#57-3] at 48:11-18, 48:25-49:7, 54:13-18, 55:24-56:8 (stating that Defendant never warned Tri-State or its heavy equipment operators of the complexities of operating locomotives linked by distributed power, that Defendant never provided any training to Tri-State employees regarding operation of locomotives in distributed power, and that Defendant never asked Tri-State if its employees were competent to operate locomotives linked by distributive power); *Ex. 3* [#57-4] at 149:23-150:1 (stating that Defendant agrees that there are grave risks posed when unqualified persons operate trains); *Ex. 5* [#57-6] at 91:4-10, 109:14-111:18 (stating that Tri-State's investigation determined that operation of locomotives in distributed power presents an unusual hazard). Thus, because the scope of Defendant's duty depends on resolution of these factual

issues, the Court cannot say as a matter of law whether Defendant's actions were adequate to comply with the scope of its duty. Based on the evidence before the Court, and as explained more fully in Section III.B. above, a reasonable jury could find for either party depending on its resolution of the genuine issues of material fact presented here.

Accordingly, Plaintiff's Motion [#57] is **granted** to the extent that the Court finds, as a matter of law, that, pursuant to 49 C.F.R. § 240, Defendant had a duty to ensure that its leased equipment was operated only by qualified locomotive engineers. Plaintiff's Motion [#57] and Defendant's Motion [#59] are otherwise **denied** to the extent that either party seeks judgment as a matter of law on any other aspect of Plaintiff's negligence claim.

## IV.  Conclusion

For the foregoing reasons,

IT IS HEREBY **ORDERED** that Plaintiff's Motion [#57] is **GRANTED in part and DENIED in part**. The Motion is **granted** to the extent that the Court finds the existence of a duty. The Motion is **denied** in all other respects.

IT IS FURTHER **ORDERED** that Defendant's Motion [#59] is **DENIED**.


Dated:  March 24, 2021                        BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge

-29-